UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA


UNITED STATES OF AMERICA  )
             )
             )  No. 1:04-CR-96
v.            )
             )  Judge Curtis L. Collier
             )
MAURICE WALLACE,    )
also known as "REECE"    )


# M E M O R A N D U M

   After three evidentiary hearings covering a span of nine months, United States Magistrate

Judge William B. Carter struggled to determine the facts surrounding the stop, search, and arrest of

Defendant Maurice Wallace ("Defendant") on May 12, 2004.  The Court is now faced with

objections to the Magistrate Judge's report and recommendation ("R&R").  Finding the record

established before the magistrate judge is too confused for the Court to comfortably decide what the

underlying facts are, the Court will **GRANT** Defendant's motion to suppress the search of his

person and vehicle, the fruits of those searches, the approximately six grams of crack cocaine found

in Defendant's pants pocket as well as approximately 32 grams of powder cocaine and two baggies

of marijuana found in his vehicle, and statements Defendant made subsequent to his arrest (Court

File Nos. 12, 19).  However, the Court will **DENY** Defendant's motions to suppress all other

evidence (*id*.).


## I.  PROCEDURAL HISTORY

   Defendant filed motions to suppress certain evidence and statements obtained as a result of

a stop of his vehicle on May 12, 2005 (Court File Nos. 12, 19) which were referred to United States Magistrate Judge William B. Carter to conduct an evidentiary hearing if necessary and make a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). On November 17, 2004, the magistrate judge filed a report and recommendation that Defendant's motion be denied (Court File No. 23). Defendant filed objections to this report and recommendation (Court File Nos. 24, 25), and, after the Court requested further briefing from the parties (Court File No. 27), the Court accepted and adopted the magistrate judge's report and recommendation and denied the motion to suppress (Court File Nos. 30, 31).

Defendant then filed a motion for additional hearing or proffer (Court File No. 32), essentially renewing his motion to suppress and requesting leave to present evidence regarding his whereabouts at the time during which the Government alleged a confidential informant bought cocaine from him. The Court also referred this motion to United States Magistrate Judge William B. Carter to determine whether to hold a hearing or accept such a proffer, whether to reconsider Defendant's motions to suppress, and whether to issue a new report and recommendation as to the motions to suppress, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). The magistrate judge held a hearing on the issue on April 8, 2005, and both Defendant and the Government subsequently filed memorandums on the suppression issue (Court File Nos. 40, 41). The Government requested an additional hearing to present further witnesses, which the magistrate judge held on June 14, 2004. The parties filed further briefs (Court File Nos. 46, 47). The magistrate judge then essentially reconsidered Defendant's motions to suppress in light of all of the evidence that had been presented over the course of the hearings and briefs, and issued a second report and recommendation resolving certain factual disputes and again recommending the Court deny the motions (Court File No. 48).

Defendant timely filed an objection to this second report and recommendation (Court File Nos. 49, 50). Defendant objects to the magistrate judge's ultimate finding Officer Harper had reasonable and articulable suspicion to stop his car, and particularly objects to the factual basis for this decision, the officers' statements they knew Defendant had sold narcotics to a CI shortly before the stop, arranged a second controlled buy in a phone call with the CI officers monitored, and followed a route to the location to which the CI directed him for the second controlled buy. Defendant argues the testimony from officers in all the hearings on this factual basis is so contradictory the record does not support a finding of reasonable and articulable suspicion for the stop. After carefully reviewing the transcripts and evidence presented from all of the hearings the magistrate judge held, as well as all of the briefs submitted on this issue and the relevant law, the Court finds the confused state of the record will not support the magistrate judge's recommendation, and the Court therefore will **NOT ACCEPT** the report and recommendation.

## II.     Standard of Review

This Court must conduct a *de novo* review of those portions of the report and recommendation to which objection is made and may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1)(C).


## III.     Relevant Facts

Defendant's objections center on the magistrate judge's findings of fact rather than his conclusions of law. For this reason, the Court will focus its analysis on the factual background of the officers' basis for the stop at issue here. Because the record is so confused, the Court will set out at considerable length the evidence presented before the magistrate judge.

3

### A. Testimony

At the first suppression hearing on September 29, 2004, Chattanooga Police Department ("CPD") Detective Todd Floyd testified he had received information from a confidential informant ("CI") Defendant was selling cocaine. Detective Floyd stated he and another officer involved in the investigation, Detective Phillip Narramore, had known this CI for approximately two years and the CI had provided reliable information in the past which had led to at least one previous narcotics arrest and conviction. Detective Floyd testified the CI assisted them by making a controlled buy of cocaine from Defendant and placing at least one telephone call to Defendant which Detectives Floyd and Narramore monitored (Court File No. 26, Trans. of First Suppression Hrg., September 29, 2004 ("First Suppr. Hrg. Trans."), pp. 6-7, 17-20, 33-34). Detective Floyd described the controlled buy in some generalized detail, stating they had met the CI, searched him and his vehicle, had him sign for the money, and surveilled him to a prearranged location where he made the purchase (*id.* at 6-7). Detective Floyd could not recall the exact day on which the controlled buy took place, but was certain it had been within 72 hours of Defendant's stop and arrest on the evening of May 12 (*id.* at 7, 17). Additionally, Detective Floyd could not recall actually recording any of the telephone calls between the CI and Defendant nor could he attest to the date or time of any of those conversations (*id.* at 18-20, 34).

Detective Floyd further testified that on the morning of the day of Defendant's arrest, the CI told him "during the latter part of the day when he got off from work" Defendant would return to his residence and thereafter be traveling with cocaine and firearms (*id.* at 12, 21-24, 26-27). At one point Detective Floyd indicated he believed the CI had spoken with Defendant earlier that day (*id.* at 22), but Detective Floyd later specifically indicated he did not know the basis of the CI's

knowledge (*id.* at 26-27). In any event, based on the entirety of the information possessed by the officers, a strategy meeting was held, a surveillance plan was agreed upon, and Officer Harper was assigned to operate a marked vehicle and stop Defendant's vehicle when instructed to do so (*id.* at 51-52). Accordingly, Detective Floyd monitored Defendant's place of work and followed him to his home when he left. Detective Floyd observed Defendant return to his home, reemerge, proceed to a residence located at 4605 Leslie Lane ("Leslie Lane residence"), stay for approximately four to five minutes, then leave and proceed to Wilcox Boulevard (*id.* at 6, 12, 23-24, 31-32, 37). At this point, "somewhere around" 8:00 p.m., Detective Floyd instructed Officer Harper to stop Defendant's vehicle (*id.* at 31, 52). A subsequent frisk of Defendant resulted in the discovery of a plastic bag containing a quantity of crack cocaine and an amount of cash. A further search of Defendant and his vehicle resulted in the discovery of quantities of cocaine hydrochloride and marijuana. Defendant was arrested, signed a written waiver of his *Miranda* rights, and made various statements to Detective Floyd regarding his drug trafficking activities. Defendant also signed a form entitled "CHATTANOOGA POLICE DEPARTMENT AUTHORIZED CONSENT TO SEARCH" during this detention, giving officers his consent to search his residence, located at 8415 Oak Drive (*see id.* at 35-37, 63-64, Govt. Exh. 3). The following day, Detective Floyd sought and received search warrants for Defendant's residence, the Leslie Lane residence, and Defendant's mother's residence on Dahlia Lane (*see id.*, Govt. Exh. 2).

At the second suppression hearing, held on April 8, 2005, Defendant presented five witnesses purporting to establish an alibi for the time period during which two documents indicate the controlled buy took place on May 12, 2004. Defendant's daughter Marisha Wallace, who was 16 at the time of the hearing, testified that on May 12, 2004, she was in the ninth grade at Tyner

Academy (Court File No. 38, Trans. of Second Suppression Hrg., April 8, 2005 ("Second Suppr. Hrg. Trans.") p. 83). Marisha testified she called Defendant to pick her up with some friends, sisters Kelsey and Latasha Sheppard, after school on May 12, 2004, where they had stayed late for after-school sports activities (*Id*. at 84-85). Marisha recalled Defendant picked them up around 5:00 p.m. and took them from school to Hardee's fast food restaurant on Shallowford Road, where they arrived around 5:10 or 5:15 p.m. (*id*. at 85). The four stayed at Hardee's for 20 to 30 minutes, while Defendant talked to a friend and they waited on their food, then Defendant drove them back to their residence and dropped them off around 6:00 p.m. (*id*. at 86-87). Marisha testified she remembered the events of this day in particular because it was the last day she saw her father before his arrest later that evening (*id*. at 86, 87). Kelsey Sheppard testified she was in the eleventh grade at Tyner Academy on May 12, 2004, Marisha testified accurately about the events and time periods she remembered, and she returned to Marisha's residence at 6:00 p.m. "or a little bit after, but it wouldn't have been before" (*id*. at 88-89, 91). Kelsey also testified she remembered this day because it was the last time she saw Defendant before he was arrested (*id*. at 90). Latasha Sheppard testified she was in the ninth grade at Tyner Academy on May 12, 2004, Marisha and Kelsey's testimony was accurate as far as she could remember, and specifically Defendant picked them up at school a little bit after 5:00 p.m. (*id*. at 93-94). Although Latasha did not give any reason why she remembered the events of that day (she testified "I just sort of remember it"), she did testify she was confident about the times and events about which she and the other girls were testifying (*id*. at 94).

Defendant's wife Almeta Wallace also testified on Defendant's behalf, stating she called Defendant on May 12, 2004 and asked him to meet her at the Conoco gas station on Brainerd Road

a little after 6:00 p.m. to give her money so she could meet a girlfriend for a drink before they went to see a play that evening, which he did (*id*. at 95-97). Mrs. Wallace also stated she knew he was picking up their daughter Marisha before that, because Marisha had called her while she was out shopping for a dress to wear to the play, and she had told Marisha to call him for a ride (*id*. at 97). Mrs. Wallace testified "he knew I was going to the play and I would see him later," but she did not know what he did after she met him at the Conoco (*id*. at 98). Mrs. Wallace estimated it would take about 20 minutes to drive from their residence to the Conoco where Defendant met her, and might take longer at the time of day when he met her because of traffic (*id*. at 115).

Finally, Defendant offered the testimony of Jerrell Manghane, who stated he was a friend of Defendant's family and saw Defendant twice on May 12, 2003 (*id*. at 99-100). First, Manghane testified he saw Defendant at Applebee's restaurant on Brainerd Road between 3:00 and 5:00 p.m., where he talked with him for a little while (*id*. at 100-101). Manghane also testified he saw Defendant later that night about to turn onto Shallowford Road just before it turns into Wilcox (*id*. at 101). Although Manghane could not remember what time of day this was, he did remember "it had just got dark," it was "after 7:00" p.m. (*id*. at 102), "it was late. It was pretty late," and it was possible it was as late as 9:35 p.m. (*id*. at 104, 105). Manghane testified it would take approximately five to seven or 10 to 15 minutes to drive from the Conoco on Brainerd Road to the spot on Shallowford Road where he first saw Defendant driving that evening (*id*. at 105). Manghane drove in front of and behind Defendant and then observed several officers exit an unmarked vehicle and remove Defendant from his vehicle (*id*. at 103-104).

The Government also presented further testimony by Detective Floyd at the second suppression hearing on April 8, 2005. Detective Floyd stated he had reviewed the case file and was

better prepared for this hearing than he had been for the first suppression hearing on September 29, 2004 (*id*. at 7, 40-41, 52-53, 55, 63). Detective Floyd testified sometime on May 12, 2004, he monitored a phone call between Defendant and the CI during which the CI placed an order to buy crack from Defendant (*id*. at 8). Detective Floyd then testified members of his surveillance team surveilled Defendant as he left work around 3 p.m. that afternoon, drove from his workplace to the Leslie Lane residence, where he stayed for four to five minutes, then drove to a prearranged location for a controlled sale to the CI (*id*. at 8-9, 37). Detective Floyd testified this sale occurred indoors where he could not observe it taking place (*id*. at 30). Detective Floyd relied on the receipt for payment to informant and chain of custody forms in testifying the controlled buy took place sometime between detectives giving the CI money for the buy at 5:00 p.m. and the CI turning over crack from the buy to them at 6:30 p.m. that evening (*id*. at 11-13, 18-20, 47-48, 51, 55-56). This testimony that the controlled buy took place within several hours of the stop and arrest is different from Detective Floyd's testimony at the first suppression hearing, during which he could not remember when the controlled buy took place, only that it occurred within 72 hours of the stop and arrest (*see supra.*).

Although the Government did not disclose the location where the controlled buy occurred to protect the CI's identity, Detective Floyd agreed with the Government the controlled buy took place in the "Brainerd Road, Wilcox, Leslie Lane, Tunnel Boulevard area in Brainerd . . . not out in East Brainerd near [Defendant's] house . . ." (*id*. at 123). Detective Floyd did not recall how long the CI took to complete the controlled buy from Defendant (*id*. at 127). Officers did not surveil Defendant after the conclusion of this sale, as they expected him to return to his residence and did not want to jeopardize the investigation by surveilling him too closely (*id*. at 28-29, 61). Detectives

then picked up the surveillance of Defendant at his residence "a little while later," observed Defendant again travel to the Leslie Lane residence, and at roughly 9:35 p.m. effected the traffic stop that led to Defendant's arrest (*id*. at 23, 60-62). Detective Floyd testified the reasons he directed Detective Harper to stop Defendant's vehicle were the controlled buy from him earlier that day and the CI's tip Defendant would have drugs on him (*id*. at 55-56).

Detective Floyd was unsure of the exact sequence of stops Defendant made between work and home on that date, contradicting himself several times during his testimony even as to whether the controlled buy took place on Defendant's travel between work and home or after he went home and departed (*id*. at 8-9, 35-41, 52, 121-124, 130). At the end of his testimony, after looking at a police report he believed Detective Narramore wrote (*id*., Def. Exh. 1) and the affidavit he drafted on May 13, 2004 in support of search warrants, Detective Floyd for the first time added that Defendant stopped at a residence on Dahlia Lane, which Detective Floyd testified was approximately a 10 to 15 minute drive from Defendant's residence, between leaving his residence and stopping at the Leslie Lane residence (*id*. at 128-30, 131).

At the conclusion of the second suppression hearing, the magistrate judge requested each party submit a written summary of the time line of events that occurred on May 12, 2004. Defendant submitted a lengthy brief pointing to inconsistencies between Detective Floyd's testimony at the September 30, 2004 hearing and the April 8, 2005 hearing (*see* Court File No. 40). The Government responded by outlining its version of the facts and requesting another evidentiary hearing to put on further testimony by Detective Narramore to clarify the facts surrounding the controlled buy (Court File No. 41).

The magistrate judge granted the Government's request and held a third suppression hearing

on June 14, 2005, during which Detective Narramore provided testimony. Detective Narramore testified he met with the CI at approximately 5:30 p.m. on May 12, 2004, the CI disclosed Defendant was selling crack cocaine in large quantities, and the CI could conduct a controlled buy from Defendant (Court File No. 51, Trans. of Third Suppression Hrg., June 14, 2005 ("Third Suppr. Hrg. Trans.") pp. 5, 11). The CI then ordered approximately five grams of crack cocaine from Defendant, and Defendant delivered it to a prearranged location on Wheeler Avenue between 6:00 p.m. and 7:00 p.m. (*id*. at 5-6, 20). Detective Narramore estimated it would take Defendant a short time to drive approximately two miles from the Leslie Lane residence to the controlled buy location. Detective Narramore further testified he observed the buy take place outside at the location, and he saw Defendant hand what appeared to be a baggie to the CI (*id*. at 16-17). Officers met with the CI after the buy, sometime after 6:30 p.m., during which meeting the CI turned in the drugs and placed another phone call to Defendant to arrange a second controlled buy (*id*. at 8, 28-29). This testimony by Detective Narramore was the first mention in testimony or documents concerning arrangements for a second controlled buy. Detective Narramore stated officers broke off surveillance of Defendant after the first buy, then picked it up again around 8:00 p.m. (*id*. at 31-32, 37). Officers believed Defendant was on his way to the same prearranged location to conduct the second controlled buy when they arrested him (*id*. at 34, 60).

### B. Documentary Evidence

Detective Floyd's affidavit in support of the search warrants, signed the day after the stop and arrest, May 13, 2004, makes no mention of a controlled buy, though it does state a CI "has been in the presence of [Defendant] within the preceding 72 hours and the CI has seen distribution quantities of cocaine base" (First Suppr. Hrg. Trans, Govt. Exh. 2, ¶ 4). The affidavit refers to a

"Maurice Williams" throughout, but the Court notes the entirety of the affidavit appears to indicate "Maurice Williams" and Defendant are one and the same (*see id.* ¶¶ 3, 5-6, 8-9). The affidavit further states Detective Floyd has known the CI for "approximately one month" and "the CI has made monitored and recorded telephone calls to distributors of narcotics, including [Defendant], for the purpose of investigation" (*id.*). Detective Floyd admits both of these statements were incorrect since he had actually known the CI for two years and had not, in fact, recorded any telephone calls between the CI and Defendant (First Suppr. Hrg. Trans. at 18-19, 29).

Additionally, the Government on November 9, 2004, more than one month after the first suppression hearing, submitted two documents to the magistrate judge as further proof of the controlled buy allegedly made by the CI from Defendant (filed with exhibits from First Suppression Hearing). The first is a two-page "RECEIPT FOR PAYMENT TO INFORMANT," Part B of which indicates Detectives Floyd and Narramore provided an unidentified informant with $250 at 5:00 p.m. on May 12, 2004, for the purpose of purchasing controlled substances to be used as evidence. Part A was apparently filled out at a later date and states as follows: "funds used to purchase ¼ ounce crack cocaine from a cocaine dealer which resulted in three search warrants one arrest and one car seized." This document contains the "Case or Reference No." of 04-65 on the first page, and 04-65 is also listed as the "Case File #" on the second page, which is entitled "ACCOUNTABILITY OF CONFIDENTIAL FUNDS" and is labeled "Form A-4."

The second document is entitled "CHAIN OF CUSTODY FORM" and indicates "one bag of crack cocaine" was confiscated on May 12, 2004, at 6:30 p.m. at 3300 Amnicola Highway. The form indicates the drugs were confiscated in a "C.I. Buy" and designates Detectives Floyd and Narramore as the officers of record, but provides no further information, other than a "Property

Number" of 04-155. Neither of these documents contains Defendant's name.

Detective Floyd during the second suppression hearing on April 8, 2005 testified the person who filled out the chain of custody form for the crack cocaine from the controlled buy did not put Defendant's name on it because Defendant did not know he was a suspect at that time; many people, including members of the public, could possibly see that form; and anyone who saw it could then tip Defendant off about the investigation into his activities (Second Suppr. Hrg. Trans. at 49-50, 56). The Government also offered testimony during this hearing by Lieutenant William Kenneth Neblette, a lieutenant who supervises the CPD special investigations unit, who offered similar testimony regarding the propriety of and reasons for not including a suspect's name on forms for evidence related to controlled buys, stating officers have the discretion of whether to do so (*id*. at 68-76).

Lieutenant Neblette also testified at the second suppression hearing chain of custody forms are sequentially numbered with a unique number that is not the same as the number assigned to each case, and the original chain of custody form contained the number "04-1551," but one digit had been cut off in photocopying such that the copy previously submitted to the Court after the first suppression hearing read "04-155" (*id*. at 71-72, 76). The copy of the form submitted into evidence as Government Exhibit 2 at this hearing clearly shows the number "04-1551" in the upper-right-hand corner.

Defendant presented part of one of these document at the third suppression hearing, the document entitled "ACCOUNTABILITY OF CONFIDENTIAL FUNDS," and labeled "Form A-4." Detective Narramore at this hearing testified this form shows the amount the CI was paid in connection with the controlled buy on May 12, 2004, both to conduct the buy and as payment for

12

his assistance (the amount given to the CI as payment for his assistance is blacked out on the form, as well as the CI's identification number, to protect his identity) (Third Suppr. Hrg. Trans. at 63). Although it does not contain the Defendant's name, Detective Narramore noted it does contain the case number assigned to Defendant's case, "04-65" (*id*. at 64). This number appears on the police reports Defendant introduced as Exhibits 1 and 2 at this suppression hearing, as well as on the "RECEIPT FOR PAYMENT TO INFORMANT" submitted to the Court subsequent to the first suppression hearing. The only document submitted in connection with this case that does not contain this number is the chain of custody form which, as explained by Lieutenant Neblette during the second suppression hearing on April 8, 2004, is given a sequential number rather than a case number to prevent identification of suspects being investigated.

The Government provided a police report that was admitted as Defendant's Exhibit 2 at the third suppression hearing on June 14, 2005, and had not been submitted to the Court before that hearing. During that hearing, Detective Narramore explained to the Court the narrative police report Detective Floyd had provided to the Court in a previous suppression hearing was only part of the full police report involving the activities on May 12, 2004, and Detective Floyd had brought only the partial report to previous suppression hearings because generating reports on the computer system is very confusing (*id*. at 42-53, *see also* Def. Exh. 1, 2 thereto). Detective Narramore further testified he believed Detective Floyd prepared these reports (*id*. at 42-43). Detective Floyd had previously testified he believed Detective Narramore prepared part of this report (Second Suppr. Hrg. Trans. at 128).

This previously undisclosed police report indicates it was prepared on May 12, 2004, and describes a meeting Detectives Narramore and Floyd had with the CI on May 12, 2004 at 5:30 p.m.,

13

during which the CI gave officers certain information about Defendant they were able to partially corroborate with a criminal history inquiry and surveillance. The report then describes the CI making a phone call to Defendant, which Detective Narramore monitored, to set up the controlled buy for 1/4 of an ounce of crack cocaine. The report further details surveillance of Defendant entering the Leslie Drive residence and staying there for approximately five minutes, then meeting the CI at a prearranged location, where he delivered approximately five grams of crack cocaine to the CI. The report ends with the statement "Det. Narramore turned in the crack cocaine into property division under property number 04-1551," the sequential number listed on the chain of custody form submitted as Government Exhibit 2 at the second suppression hearing on April 8, 2005.

Defendant also submitted a second police report, admitted as Defendant's Exhibit 1, at the third suppression hearing. What appears to have been an early draft of this police report was admitted as Defendant's Exhibit 1 at the second suppression hearing, but it was not extensively discussed. This report describes surveillance of Defendant beginning at 8:00 p.m. on May 12, 2004, and his subsequent arrest, and indicates it was prepared on May 14, 2004, two days after the arrest.

Although this police report does not expressly indicate officers asked the CI to set up a second controlled buy with Defendant on May 12, 2004, it does state, "On May 12th 2000 hrs, 2004 Police received information from a confidential informant that Maurice Wallace would be delivering cocaine to a prearranged location." This report goes on to describe surveillance of Defendant, during which he was observed traveling from his residence on Oak Drive to the Leslie Lane residence where he stopped for approximately five minutes, then proceeding to Wilcox Boulevard, where Detective Harper activated the blue lights on his marked police car, pulled Defendant over,

and arrested him. This report goes on to detail the search of Defendant and his vehicle and statements Defendant made subsequent to his arrest.

Detective Narramore went through both of these reports during his testimony at the third suppression hearing and indicated they are correct in stating Defendant stopped by the Leslie Lane residence twice, once before the first controlled sale and then later on his way to the second controlled sale, although he was not actually involved in surveillance of Defendant's second stop at the Leslie Lane residence, so he did not have personal knowledge on that issue (*id.* at 58).

## IV.    Analysis

### A.    Stop, Frisk, Arrest, and Search of Vehicle

The Court previously reviewed the legality of the stop of Defendant's vehicle and determined the officers' collective knowledge Defendant had very recently sold drugs to the CI and had made telephone calls to set up that transaction, and the CI had stated Defendant would be traveling with more drugs and/or a gun after leaving work and returning home on the evening of May 12, 2004, combined with the results of the investigation to that point, were sufficient to create a reasonable and articulable suspicion criminal activity was afoot, which supported a stop of Defendant's vehicle under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (*see* Court File No. 30). The issue before the Court here is the same as that in its prior ruling on the magistrate judge's first report and recommendation, whether Officer Harper had reasonable suspicion, under *Terry*, to stop Defendant's vehicle on May 12, 2004, or whether the stop and subsequent searches violated his rights under the Fourth Amendment of the United States Constitution. This inquiry in turn rests on whether the Court finds credible officers' testimony about the controlled buy that served as the main

15

basis for information Officer Harper received from other officers, and on which he based his stop of Defendant on that evening.

When reviewing a magistrate's credibility determinations on a motion to suppress, the district court may accept or reject the magistrate's determinations recognizing a magistrate is in a better position to assess the credibility of witnesses he sees and hears. *United States v. Raddatz*, 447 U.S. 667, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980); *United States v. Ailemen*, 986 F. Supp. 1228 (N.D. Cal. 1997). Credibility determinations of the magistrate who personally listened to the testimony of a witness should be accepted by a district judge unless in his *de novo* review of the record he finds a reason to question the magistrate's assessment. *Blizzard v. Quillen*, 579 F. Supp. 1446 (D. Del. 1984).

Here, after carefully reviewing all of the transcripts, evidence presented, and briefs, the Court concludes it is simply not possible to determine from the record the facts. Credibility determination means something more than picking pieces of Defendant Narramore's testimony to accept. Considering the totality of the evidence, the Court must reject the magistrate judge's credibility findings as to Detectives Floyd and narramore. Had the officers' testimony been inconsistent at the different hearings merely on specific but immaterial facts, the Court could disregard those inconsistencies as unimportant. But here, the officers' testimony was not only inconsistent, it changed significantly from hearing to hearing and seemed to be based on their review of the contents of the case file rather than their independent recollection. The Court will not detail every inconsistency, since Defendant has done so extensively in his filings (*see* Court File Nos. 25, 40, 46). Suffice it to say they are many and troubling. The Court will highlight a few it found particularly unsettling.

16

At the first hearing, Detective Floyd could not recall when the controlled buy took place, only that it was within 72 hours of the arrest. This testimony is consistent with information in a document he had in front of him at the hearing, the affidavit he prepared in support of the search warrants (*see* First Suppr. Hrg. Trans., Govt. Exh. 2, ¶ 4). Then, at the second hearing, after reviewing the entire file but after much time had passed since the events took place, Detective Floyd testified the controlled buy actually took place between 5:00 p.m. and 6:30 p.m. on the day of the stop and arrest, within hours of the stop. This is consistent with documents not present at the first suppression hearing but that was present at the second suppression hearing, the "RECEIPT FOR PAYMENT TO INFORMANT" and "CHAIN OF CUSTODY FORM" (see Second Suppr. Hrg. Trans., Govt. Exh. 1, 2). This change in testimony is striking in and of itself, but Detective Floyd further testified he observed Defendant at the prearranged location for the controlled buy and that it took place inside where he could not observe it. Additionally, Detective Floyd was very confused and contradicted his own testimony many times when trying to describe the sequence of Defendant's actions on that day, including when the controlled buy fit into the sequence. At the third hearing, Detective Narramore contradicted Detective Floyd's testimony several times, in particular stating the controlled buy took place outside and he observed Defendant hand a baggie to the CI. Detective Narramore also testified he had instructed the CI to arrange a second controlled buy from Defendant, a fact to which no other witness had testified and which is not mentioned in any document submitted to the Court throughout the suppression hearings. The Court is frankly uncertain which version of events to which Officer Floyd testified it should credit, and therefore finds it cannot credit any of them. While Detective Narramore's testimony is more internally consistent than Detective Floyd's testimony, it contains facts not supported by any other evidence, and standing on its own is not

17

sufficient for the Court to find Defendant participated in a controlled buy shortly before his arrest. Additionally, although Defendant's alibi witnesses do not conclusively establish Defendant could not have participated in a controlled buy between 5:00 and 6:30 p.m. on May 12, 2004, their testimony was consistent and included many stops Defendant made in his travels on that day about which none of the officers who stated they surveilled him that day testified. This testimony casts further doubt on that of Detectives Floyd and Narramore.

Although some of the documentary evidence would seem to support the officers' assertions at the second and third suppression hearing that a controlled buy involving Defendant took place a few hours before Defendant was stopped and arrested, not all of the documentary evidence corroborates these assertions. Even the documentary evidence that is most supportive of the officers' assertions about the controlled buy, the police report introduced as Defendant's Exhibit 2 at the third suppression hearing, cannot totally be credited because the officers were not even sure which one of them drafted it. This report on its own, in light of the lack of consistent testimony on this issue, would not be sufficient for the Court to find Defendant participated in a controlled buy shortly before his arrest. Additionally, the police report describing the events leading to the arrest of Defendant makes no mention of any controlled buy, much less that Defendant was on his way to a second controlled buy when he was stopped (*see* Third Suppr. Hrg. Trans., Def. Exh. 1).

Further, the affidavit Detective Floyd drafted in support of the search warrants, which he prepared the day after the controlled buy allegedly took place, fails to mention a controlled buy, and incorrectly identifies Defendant as "Maurice Williams" throughout. This affidavit also states Detective Floyd had known the CI for approximately one month and he had recorded phone calls between the CI and Defendant, but Detective Floyd testified he had known the CI for two years and

18

had not recorded any telephone calls between the CI and Defendant. Two of the documents relating to the controlled buy, entitled "RECEIPT FOR PAYMENT TO INFORMANT" and "ACCOUNTABILITY OF CONFIDENTIAL FUNDS" are only linked to this Defendant by the case number officers testified is associated with his case, not his name or other corroborating facts, and there is no evidence in the record that this case number relates only to Defendant and not other suspects. Further, the third document relating to the controlled buy, the "CHAIN OF CUSTODY FORM" for the crack cocaine allegedly seized from the CI after the controlled buy, is not linked to Defendant anywhere on its face, and is only linked to Defendant through its mention in the police report introduced as Defendant's Exhibit 2 at the second suppression hearing. Additionally, there is no documentary evidence in the record to support Detective Narramore's assertion, brought up for the first time at the third suppression hearing on June 14, 2005, that a second controlled buy had been set up between Defendant and the CI and was part of the basis for the officers' belief Defendant would have drugs on his person or in his car because he was on his way there, providing part of their asserted reasonable suspicion to pull him over.

The Court would note it also is troubled by the fact the documentary evidence in this case trickled in over many months, with some documents being submitted a little more than a month after the first suppression hearing and the last police report not being presented until the third hearing on June 14, 2005, almost a full year after the first suppression hearing. It was particularly unhelpful to the Court in reaching a decision the evidence was presented in a piecemeal fashion. The Court attributes this to the Government having other demands on its time so that it devoted too little attention to the preparation of this case. Another contributing factor in the Court's opinion was the lack of involvement by federal law enforcement agents. The officers involved in this case might

well have been unfamiliar with the more strenuous requirements of federal courts.

The Court here reiterates the burden of proof on this motion: Although the proponent of a motion to suppress generally bears the burden of establishing his or her Fourth Amendment rights were violated by a challenged search or seizure, *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S. Ct. 421, 424 n. 1, 58 L. Ed. 2d 387 (1978), it is the Government's burden to demonstrate by a preponderance of the evidence that a particular seizure was based on either probable cause or reasonable suspicion. *United States v. Baldwin*, 114 Fed. Appx. 675, 681 (6th Cir. 2004); *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990); *United States v. Townsend*, 138 F. Supp. 2d 968, 972-73 (S.D. Ohio 2000). The Court cannot find the evidence the Government has presented supports a finding this stop was based on reasonable suspicion in accordance with *Terry*, 392 U.S. 1.

In a case such as this one, where the documentary evidence is poorly identified, contains mistakes and inconsistencies to which officers admitted but could not explain during hearings, and does not explicitly link the alleged controlled buy to Defendant, and the officers' testimony Defendant was involved in the controlled buy is so internally inconsistent and contradictory as to be unpersuasive, the Court finds the record does not support the conclusion the officers had reasonable suspicion to stop Defendant. The Court agrees with the magistrate judge's comment it does not appear any officer who testified during these suppression hearings was intentionally attempting to mislead the Court. However, a lack of an intent to deceive does not render this testimony sufficient to support a finding Officer Harper had reasonable suspicion to stop Defendant's vehicle. While the Court can find, based on the documentary evidence, a controlled buy took place between a CI and *some* individual crack cocaine dealer, the sum of the evidence in

the record does not support a finding *Defendant* was the individual who sold the crack cocaine during that controlled buy. From the officers' testimony, the Court cannot with any certainty find the information given to Officer Harper by Detective Floyd or Detective Narramore about this controlled buy was accurate, such that it gave Officer Harper a reasonable and articulable suspicion criminal activity was afoot. *Terry*, 392 U.S. at 30.

Because the Court finds Defendant was unlawfully detained in violation of his rights under the Fourth Amendment, the fruits of that illegal detention must be suppressed. Therefore, the Court will **GRANT** Defendant's motion to suppress the results of the subsequent frisk of Defendant (approximately six grams of crack cocaine found in Defendant's pants pocket) and the search of Defendant's vehicle (approximately 32 grams of powder cocaine and two baggies of marijuana) as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *accord. United States v. Smith*, 263 F.3d 571, 594-95 (6th Cir. 2001).

### B.      Statements

The Court also finds the statements Defendant made subsequent to the illegal stop, search, and arrest must be suppressed as fruit of the poisonous tree. *See Brown v. Illinois,* 422 U.S. 590, 602, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975). The Government has the burden of proving the admissibility of a confession following an illegal arrest or search. *Kaupp v. Texas*, 538 U.S. 626, 633, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003). The Government in its briefs and during hearings focused on whether Defendant's statements were voluntary, although Defendant argued in his motions to suppress they were inadmissible because they were coerced as well as because they were fruit of the poisonous tree. The Government has not presented any evidence relevant to the Court's inquiry regarding these statements, particularly the factors elaborated by the Supreme Court in

21

*Brown*:

> The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

422 U.S. at 603-04 (internal citations omitted). From the testimony and briefs, it appears Defendant was given *Miranda* warnings, but the temporal proximity between the arrest and the statements was very close. The Government also has not pointed to any "intervening circumstances" that severed the causal connection between the illegal stop, searches, and arrest from the statements. *See id* at 604-05*; see also Taylor v. Alabama*, 457 U.S. 687, 691, 73 L. Ed. 2d 314, 102 S. Ct. 2664 (1982) (finding that three *Miranda* warnings by police officers did not constitute "intervening events" to purge original taint of illegal arrest). The Government has not met its burden of showing these statements are admissible.

Therefore, the Court will **GRANT** Defendant's motion to suppress these statements as fruit of the poisonous tree. *See generally Brown,* 422 U.S. 590.

### C.     Searches of Residences

As to evidence seized during the searches of two residences using search warrants based in part on the illegal statements Defendant gave, the Court previously held Defendant had no standing to challenge the search of the Leslie Lane residence because he did not live there (*see* First R&R, Court File No. 23, p. 17-18; adopted by the Court without analysis in Court File Nos. 30, 31), but did not specifically address the search of Defendant's own residence, although it denied Defendant's motion to suppress the evidence from his residence. The Court now specifically addresses the search of Defendant's own residence, and finds this evidence also need not be suppressed.

22

First, the Court must evaluate whether Defendant gave valid consent for this search. Defendant, while detained subsequent to the stop, search, and arrest, signed a consent form purporting to give his consent to a search of the residence (*see* First Suppr. Hrg. Trans., Govt. Exh. 3).[1] "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)). However, this exception to the warrant or probable cause requirement for a search applies only where the consent is valid. The Court must consider the "totality of the circumstances" in determining whether Defendant voluntarily consented to the search. *See United States v. Hudson*, 405 F.3d 425, 443 (6th Cir. 2005) (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)). "Consent must be . . . unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." *United States v. Butler*, 223 F.3d 368, 375 (6th Cir. 2000) (*quoting United States v. Williams*, 754 F.2d 672, 674-75 (6th Cir. 1985)).

Testimony by Detective Floyd at the first suppression hearing indicated this consent form was signed at the conclusion of questioning by officers and after Defendant was told officers already had obtained a warrant to search his residence (First Suppr. Hrg. Trans. pp. 36-37, 42). Defendant himself testified he had not been shown a search warrant but "without a doubt [he] knew" the officers were going to procure a search warrant (*id*. at 64). Defendant further testified "I felt it was pressure to sign [the consent form] because they kept constantly telling me they were going to arrest

---

[1]The Court notes it is uncomfortable with this document as evidence of valid consent to search, as it is dated "5-5-04", one full week *before* Defendant was arrested on May 12, 2004. While Defendant testified at the first suppression hearing he signed this form after his arrest, the form is dated earlier. No explanation was given for this.

23

my wife and my mom and cousin," and also because he knew the officers were in the process of procuring search warrants (*id.*).

The magistrate judge in his initial report and recommendation credited Officer Harper and Detective Floyd's testimony Defendant's accusations of officers' threats to arrest his family members were untrue, and found "the agents did not use intimidation, trickery or deceit to elicit his statements and wavier" (First R&R, Court File No. 23, p. 16). The magistrate judge further found Defendant voluntarily consented to the search of his residence (*id.* at 17). Defendant did not object to this conclusion, and the Court adopted this portion of the R&R (*see* Court File Nos. 30, 31). The Court finds nothing in the record that contradicts its earlier holding Defendant's consent to this search was not due to threats by officers they would arrest his family members.

However, the magistrate judge did not consider whether this consent was ineffective because Defendant gave it while he was in custody as a result of an illegal stop, search, and arrest. *See Florida v. Royer*, 460 U.S. 491, 497-501, 507-08 (1983) (evidence obtained as a result of consent to search given while illegally detained must be suppressed because taint of illegal detention invalidates consent). The Sixth Circuit has stated, "if a consent to search is given after an illegal seizure, evidence obtained pursuant to the consent to search must be suppressed, unless the consent is sufficiently attenuated from the illegal seizure such that the consent is the product of an intervening act of free will." *United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003) (*citing United States v. Caicedo*, 85 F.3d 1184, 1190 (6th Cir. 1996); *United States v. Richardson*, 949 F.2d 851, 858 (6th Cir. 1991); *United States v. Buchanan*, 904 F.2d 349, 355-56 (6th Cir. 1990)). The factors set out in *Brown* also are examined in this inquiry. *See id.* at 630-31. As analyzed *supra* with regard to statements Defendant made subsequent to the arrest, the Government has not shown

any circumstances that would attenuate Defendant's consent from the illegal stop, search, and seizure "such that the consent is the product of an intervening act of free will." *Id*. at 629. Therefore, Defendant's consent was not valid to justify this search of his residence.

However, officers also had obtained a warrant to search Defendant's residence. Defendant has argued this cannot be a legal basis for the search of his residence because the affidavit upon which the warrant was issued included statements the Court has ruled must be suppressed (*see* Court File No. 20). The search warrant will be upheld if the Government can show it was based on sources "wholly independent of any constitutional violation," because the independent source doctrine would then apply to uphold its admissibility. *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996); *see also Murray v. United States*, 487 U.S. 533, 541, 101 L. Ed. 2d 472, 108 S. Ct. 2529 (1988); *accord United States v. Jenkins*, 396 F.3d 751 (6th Cir. 2005). The independent source doctrine is based on the idea the police should not be in a worse position than they would have been in absent any error or misconduct; therefore, the Court must determine whether, "granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Leake*, 95 F.3d at 412 (*quoting Wong Sun*, 371 U.S. at 488).

In application, if a magistrate judge's decision to grant a search warrant was affected in a "substantive, meaningful way" by information obtained by illegal means, evidence seized pursuant to that warrant must be suppressed. *See Jenkins*, 396 F.3d at 758. However,

> . . . the simple fact that an application for a warrant contains information obtained from an illegal search does not by itself signify that the independent source doctrine does not apply. [*United States v. Herrold*, 962 F.2d 1131, 1141 (3d Cir. 1992)]. If the application for a warrant "contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were not prompted to obtain the warrant by what they

observed during the initial entry." *Id.* at 1141-42.

*Jenkins*, 396 F.3d at 758. Therefore, the Court must evaluate whether the affidavit, redacted to remove information tainted by the illegal stop, search, and arrest, supports a finding of probable cause. *Id.*

To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *Id.* at 760 (*quoting United States v. Bowling*, 900 F.2d 926, 930 (6th Cir. 1990)). The Court must evaluate the totality of the circumstances in making this determination. *Illinois v. Gates*, 462 U.S. 213, 230, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983).

The Court has reviewed the affidavit prepared by Detective Floyd in support of the application for search warrants, and finds only a small portion of it is based on statements Defendant made the Court has determined must be suppressed (*see* Government Exhibit 2 at the First Suppression Hearing). Of the five-page affidavit, three paragraphs contain information gained from the illegal stop, search, and arrest of Defendant (*id*. ¶¶ 5, 8, 0). The affidavit contains other information obtained lawfully from two CIs, the NCIC database, and surveillance of Defendant (*id*.). However, while the affidavit does detail information the CI had provided concerning Defendant's drug dealing activities and frequent possession of firearms (which he is prohibited from carrying due to a prior felony conviction) (Government Exhibit 2 at the First Suppression Hearing, ¶¶ 3, 4, 7), the redacted affidavit does not indicate the Oak Drive residence is Defendant's residence or include any facts that would indicate evidence of a crime would be found at the residence. Therefore, the redacted affidavit does not support a finding of probable cause to search Defendant's residence because it does not provide "a fair probability that evidence of a crime will be located on the

26

premises of the proposed search." *Jenkins*, 396 F.3d at 760.

But, the Court's decision on this point is dictated by yet another doctrine, the "good faith" exception to the exclusionary rule. The Supreme Court has held that the exclusionary rule "should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Leon*, 468 U.S. 897, 905, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984). The "good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . . may be considered." *Id.* at 922-23 n.23. "Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.* at 922 (internal quotations omitted). Courts have held, however, *Leon*'s good faith exception will not apply in the following sets of circumstances: 1) the supporting affidavit contained knowing or reckless falsity; 2) the issuing magistrate wholly abandoned his or her judicial role; 3) the affidavit is so lacking in probable cause as to render official belief in its existence entirely unreasonable; or 4) where the officer's reliance on the warrant was neither in good faith nor objectively reasonable. *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005) (*quoting Leon*, 468 U.S. at 923). After reviewing the totality of the circumstances, the Court finds the good faith exception to the exclusionary rule applies here. A reasonably well trained officer would not have known that the search was illegal despite the magistrate's authorization, because the reason the search was illegal, subsequent suppression of Defendant's statements upon which the affidavit was partly based, could not have been known at the time of the magistrate's authorization. Further, there is no evidence in

27

the record any of the four circumstances elaborated in *Frazier* apply here. Accordingly, under *Leon*'s rationale, the results of this search need not be suppressed because the purpose of the exclusionary rule, to deter police misconduct, would not be served by excluding this evidence that was seized by officers acting in good faith. *Leon*, 468 U.S. at 916.

The Court therefore will **AFFIRM** its previous denial of Defendant's motion to suppress evidence seized in the searches of the Leslie Lane residence and his own residence.


## V.      Conclusion

Because the Court finds the Government has not met its burden of proof, the Court will **GRANT** Defendant's motions to suppress the search of Defendant's person and vehicle, and the fruits of those searches, the approximately six grams of crack cocaine found in Defendant's pants pocket as well as approximately 32 grams of powder cocaine and two baggies of marijuana found in his vehicle, and statements Defendant made subsequent to his arrest (Court File Nos. 12, 19). However, the Court will **DENY** Defendant's motions to suppress all other evidence (*id*.).

An Order shall enter.


**/s/**_____
**CURTIS L. COLLIER, CHIEF**
**UNITED STATES DISTRICT JUDGE**